# OCTOBER 30, 1935

### C. L. DOWNEY v. THE STATE.

No. 17716.  Delivered October 30, 1935.

The opinion states the case.

*D. C. Bland,* of Orange, and *Mike Daughtry* and *Howth, Adams & Hart,* all of Beaumont, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

LATTIMORE, JUDGE.—Conviction for assault to murder; punishment, one year in the penitentiary.

Appellant herein is a young man, apparently holding a responsible position as the representative at Beaumont, Texas, of the Southern Stevedoring & Contracting Company, whose business it was to contract for and conduct the loading and unloading of freight ships. The work of so loading and unloading ships was actually done by longshoremen. In Beaumont at the time of this trouble there were white and colored longshoremen unions, and either as a result of racial differences or otherwise there was much controversy as to who should load and unload certain ships. The matter seems to have been referred to a meeting or convention of longshoremen, and subsequent to this meeting appellant was notified by his superiors that the colored longshoremen at Beaumont were to have the privilege and right to unload certain ships, among them being what was known among longshoremen as the ships of the Bull Line. One of the ships of this line had docked at Beaumont. The colored longshoremen appeared and undertook to unload it. A large company of the white longshoremen also appeared and seem to have claimed the right to unload half the ship. The colored longshoremen laid hold of one end of the unloading trays and the white longshoremen the other end of said trays. This was about one o'clock on the day of the difficulty. At about this time some one,—apparently from among the negroes,—called out to let them have it, or give it to them, and immediately a volley of shots was fired. According to most of the testimony this volley of shots lasted but a few seconds, and after it ended there was no more shooting.

On the wharf, and evidently rather close to the edge thereof, was a line of railroad on which were empty box cars. Almost directly in front of a warehouse on the opposite side of this wharf from where the ship was docked, was the office occupied by this appellant. Apparently directly in front of the door

to this warehouse there was a cut or passage way between two box cars which had been uncoupled or pulled apart, leaving an open space of apparently from three to six feet in width. When the shooting began it seems clear that most, if not all, of the white men on the river side of these box cars tried to get through this open space between the box cars and into the warehouse, or find some other place of safety. Among the white longshoremen were C. L. Smith, the alleged injured party in this case, and two other men, one named Cash and the other Hendrickson. These three witnesses were relied upon by the State chiefly to make out its case.

It seems hardly necessary to set out at length the testimony of these witnesses as to the facts surrounding the alleged shooting by this appellant, further than to say that it is in a condition of irreconcilable conflict. Smith testified that appellant shot at him, or shot as his legs twice under one of the box cars next to the cut, and that he continued on his way to and through said cut, and that when he got to the corner of the box car, appellant, from a crouching position on the opposite side of said car, shot again under the drawhead of the car; that he, Smith, continued his way through said cut, and as he neared appellant the latter straightened up and fired two more shots. Smith, when pinned down, testified that appellant shot in his direction. He would not swear that appellant shot at him. He was not struck by any of the bullets, if there were any bullets in the cartridges. He says he went on through the cut between the cars and into the warehouse. He denied at first entertaining any feeling of revenge or bitterness against appellant, but later admitted that he did entertain a feeling of resentment toward him because he thought appellant might have so ruled or decided as that he could have given the white men the right to unload the ships of the Bull Line.

State witness Cash testified that he was on the river side of the same box car under and around which Smith said appellant fired twice at his legs under said car. State witness Hendrickson testified that he was on the river side of the same box car near which Smith was at the time the latter claims appellant shot at him twice under said box car. Hendrickson said that when the shooting began he went under the box car referred to, and rolled over and over until he reached the side of the box car nearest the warehouse. He testified that if anybody shot under the box car while he was under there, he knew nothing about it; that he was not conscious of anybody having fired a shot under that car while he

was there. He testified that when he got over to the warehouse side of the car he saw appellant shoot as though he was shooting through the cut between the cars. At that time he saw the pant legs of somebody, the upper part of whose body he could not see, but when he came out from under the car he saw that the person whose pant legs he had seen was Smith. He testified that appellant shot in the direction of Smith. We quote from his testimony: "Whether he was shooting at Smith,—well, Smith was the only one there. He was the only one around there that I saw. He was the only one standing there. Other men were passing along there. I didn't say that he shot at Smith. I say he was shooting in Smith's direction. For all I know, he might have been shooting at somebody else. Certainly, I mean to tell the jury that Downey shot at Smith, shooting at him with intent to hit him. I could say he was shooting at Smith. Certainly, I am positive he was shooting at Smith. He was shooting at Smith. I made the statement while ago all I meant to tell the jury was he was shooting in Smith's direction and might have been shooting at somebody else. I meant he must have been shooting at Smith, because Smith was right there looking at him. I could see Smith's feet. You can tell by a man's feet which way he is facing, can't you? I positively did not say I could tell by Smith's face Downey was shooting at him. I did not see his face. * * * I couldn't see Mr. Smith's face when Downey was shooting at him. All I could see was his feet, and I could see by his feet that he was facing Downey. I had to look underneath the axles * * ** I saw Downey run before I got from underneath the car, and then I turned my head and looked in the opposite direction over towards the ship and saw a pair of legs standing in the position that I have shown on this diagram. * * * I had not seen Smith's legs at the time Downey shot. After the shooting was over * * * I saw a pair of legs in the space between those two cars. * * * I had not seen those legs before that."

State witness Cash said that he was behind Smith as Smith approached the cut in the cars, and that he saw appellant fire a pistol. He said at the first shot appellant stooped down next to the car wheel, and at the second shot he raised up and fired. He said that appellant shot toward Smith. He would not say that appellant shot at Smith. He admitted that he told officers that appellant shot in the direction of Smith. Witness said he was hitting it up and trying his best to get away from where the shooting was going on at the time he

was trying to get between said cars. On cross-examination this witness testified that appellant fired two shots, and that appellant was "Squatting down" when he fired the first shot, and was "Hunkered over" when he fired the second shot; that both shots were fired practically in the same direction, which would be the direction toward the ship. He said both he and Smith were trying to get away from the negroes who were firing on the ship, both trying to get to the warehouse, get through that opening to the warehouse, and that he was almost exactly behind Smith when both shots were fired. He said: "There was as much reason to suppose he shot at me as there was to suppose that he shot at Smith, both right there together, within one foot of each other."

It was shown by the police authorities of the city of Beaumont that on the morning in question and shortly before the trouble, appellant had come down to police headquarters to try to induce them to send men down to the wharf to prevent trouble between white and colored longshoremen. One of the policemen testified that he talked to appellant at one o'clock, and appellant tried to get him to send men down immediately. By witnesses appellant showed that he was in the office telephoning to the police at the time the volley of shots were fired, and was not out on the wharf, and could not have participated in the shooting. By other witnesses it was shown that they were in the warehouse and knew appellant was in his office at the time the shooting took place on the outside, and that appellant did not come out of his office until all the shooting was over. By other witnesses it was shown they were familiar with the interior of the office, and that no pistol was kept therein. Appellant himself testified that he was in the office calling the officers at the time the shooting occurred, that there was a volley of shots, and no more shooting thereafter. Appellant denied emphatically that he had anything to do with the shooting. We are of opinion that the testimony for the State is in such condition of conflict as that the verdict should not have been permitted to stand.

We are also of opinion that the learned trial judge erred in not submitting to the jury the law of aggravated assault. In the absence of any testimony that appellant shot at, or that he tried to shoot any particular person, or that he had malice or animus toward Smith, the jury might have believed that if he used a pistol he was using a deadly weapon with intent to frighten or to alarm other persons.

We are of opinion that error is reflected by appellant's

bill of exceptions No. 4. From same we learn that, over objection, the State was permitted to prove that a number of the negroes, present and participating in the shooting, had been convicted or had pleaded guilty and been given terms in the penitentiary. We see nothing in this testimony showing any relevance whatever. The court qualifies appellant's bill of exceptions by attaching the questions and answers of the witness, but the appellant excepted to this qualification and same is attested over the judge's signature, and in this condition we can not consider the qualification. The precedents are numerous.

We think also error appears in appellant's bill of exceptions No. 5. Appellant undertook to prove by his superior Mr. Eikel that about one o'clock the day of the difficulty, appellant called him and told him that white longshoremen had gathered on the wharf in question in large numbers, and were threatening to load and unload the ships, and to exclude the negro longshoremen by force from doing the work, and that appellant asked witness, what he, appellant, should do, and that Mr. Eikel instructed him to do nothing more than to call the police for protection, as he had already done, and to not leave the office, and not to have anything to do with the trouble between the contending factions. It appears clear that this testimony was in line with what appellant himself claimed he did on the occasion, and which is corroborated by the testimony of other witnesses who were present and testified to the movements of appellant and we think it admissible. There are numerous other matters complained of by bills of exception, which we deem not necessary to discuss.

For the errors mentioned the judgment will be reversed and the cause remanded.

*Reversed and remanded.*